UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MARK A. PIROG,

                          Plaintiff,

                                                          **REPORT AND**
          -against-                                       **RECOMMENDATION**

CAROLYN W. COLVIN,                                        15 Civ. 0438 (KMK) (PED)
Acting Commissioner of Social Security,

                          Defendant.
-------------------------------------------------------X


TO THE HONORABLE KENNETH M. KARAS, United States District Judge:

## I. INTRODUCTION

Plaintiff Mark A. Pirog brings this action pursuant to 42 U.S.C. § 405(g) challenging the

decision of the Commissioner of Social Security (the "Commissioner") denying his application

for benefits on the ground that he was not disabled within the meaning of the Social Security Act

(the "SSA"), 42 U.S.C. §§ 423 *et seq*.  The matter is before me pursuant to an Order of

Reference entered January 23, 2015.  (Dkt. 4).  Presently before this Court are the parties' cross-

motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure (Dkt. 12 (plaintiff's motion), 13 (plaintiff's memorandum of law in support), 14

(defendant's motion), and 15 (defendant's memorandum of law in support)).  For the reasons set

forth below, I respectfully recommend that plaintiff's motion be **DENIED** and that defendant's

motion be **GRANTED**.

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security

Administration (Dkt. 9), filed by defendant in conjunction with the Answer (Dkt. 8).

A.    Application History

Plaintiff was born on December 12, 1968.  R. 307.  He graduated from high school and worked as a corrections officer from 1993 until January 18, 2008.  R. 44, 76, 126, 342.  Plaintiff injured his back in August 2005 while restraining an inmate at work.  R. 595.  In December 2006, plaintiff sustained a hypertension and twisting injury to his left knee during another job-related accident, when he tripped over a floor mat.  R. 642.  He then took disability retirement from the Corrections' Department, and currently receives just over $1,800 per month as disability pension in addition to over $1,700 per month in Workers' Compensation.  R. 81.

On or about November 3, 2008, plaintiff (by and through counsel) applied for Supplemental Security Income disability benefits, alleging that he had been disabled since January 18, 2008, due to back and knee impairments.  R. 341-42.  His claim was administratively denied on January 20, 2009.  R. 165-72.  On February 10, 2009, plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on March 19, 2010.  R. 40-71, 173.  On July 30, 2010, plaintiff's claim was administratively denied.  R. 141-57.  On May 25, 2011, the Appeals Council issued a written decision in which it vacated the ALJ's decision and remanded the case for further proceedings to resolve an issue regarding the proffer of additional evidence.[1]  R. 158-61.  On January 8 and February 22, 2013, plaintiff and

---

[1]  The Appeals Council described the issue as follows: "The record shows that additional evidence from the State of New York Worker's Compensation Board, Middletown Medical Center and Vincent Vigilante, M.D. was received post hearing (Exhibits 18F, 19F and 20F).  The evidence was made part of the record and considered in the decision.  However, the Administrative Law Judge did not proffer the additional evidence to the claimant or his representative.  HALLEX I-2-7-30A directs that the Administrative Law Judge must proffer all post hearing evidence, unless the claimant has knowingly waived the right to review the post hearing evidence.  Further considering of the post hearing examinations is necessary."  R. 159.

his attorney appeared before the ALJ for additional hearings. R. 72-139. Vocational Expert

Raymond Cestar also testified at the February 22, 2013 hearing. On April 11, 2013, the ALJ

issued a second decision finding that plaintiff was not disabled, after considering the case *de*

*novo*. R. 10-36. The ALJ's decision became the final order of the Commissioner on November

17, 2014, when the Appeals Council denied plaintiff's request for review. R. 1-6. Plaintiff

timely filed this action on January 21, 2015. (Dkt. 1).

B.    Treatment Before the Alleged Onset Date

A December 18, 2006 x-ray "reveal[ed] that the bone mineralization [was] normal," that

there was "no fracture or dislocation," and that there was "a large joint effusion accumulating

interior to the distal femur." R. 629, 642. An x-ray of plaintiff's thoracic spine on January 11,

2007 revealed an "essentially unremarkable thoracic spine" with "minimal degenerative change

of the mid thoracic spine." R. 709. Plaintiff underwent a left knee arthroscopy with medial

femoral chondroplasty and lateral plicectomy operation on October 30, 2007 because although

an MRI showed "just some synovitis" in his left knee, he "failed non-operative management"

and "continue[d] to have pain with snapping" in his knee. R. 633-35.

C.    Treating Sources

The administrative record contains various medical and other treatment records. The

following is a distillation of their relevant points.

1.    Dr. Kevin Trapp

After his left knee surgery, from May 2008 through January 2009, plaintiff sought

treatment for continued knee pain from Dr. Kevin Trapp. On May 5, 2008, Dr. Trapp noted that

"[o]verall his knee [was] doing very well," and that plaintiff's "occasional pain [was] tolerable."

R. 442. Dr. Trapp assessed that plaintiff was "doing well at [the] time." R. 443. On August 4,

2008, Dr. Trapp noted that plaintiff had "recently developed some occasional pain and on

September 19, 2008, Dr. Trapp opined that plaintiff had "occasional pain in the knee but [was]

overall doing well." R. 438.  Over the course of his visits, plaintiff presented with a reduced

range of motion and mild effusion, but no tenderness other than tenderness over his patellar

tendon on some occasions, and no pain in weight bearing or range of motion.  R. 436.  In

October 2008, plaintiff received an injection of 80 mg Depo-Medrol and 3cc half percent

marcaine[2] for his pain.  R. 437.

Dr. Trapp referred plaintiff for an Open MRI, which plaintiff received on January 23,

2009.  The MRI revealed a "1. small linear intrasubstance tear of the posterior medial meniscus,

not extending to the articular surfaces. 2. Mild chondromalacia[3] of the medial facet of the patella.

[and] 3. No evidence of patellar tendinitis or osteochondral lesion."[4] R. 1089.

Dr. Trapp examined plaintiff's left knee again on February 13, 2009.  R. 1062.  Plaintiff

reported that his pain had worsened, and caused him to lose balance and fall, injuring his right

knee and causing right knee pain along the medial joint line.  Id. 1062.  However, Dr. Trapp's

_____

[2]  Depo-Medrol is a corticosteroid used to relieve inflammation (swelling, heat, redness, and pain).  Marcaine is a local anesthetic.  See MedlinePlus, a service of the U.S. National Library of Medicine and the National Institutes of Health, available at https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html; https://www.nlm.nih.gov/medlineplus/druginfo/meds/a614001.html.

[3]  Chondromalacia is "the softening and breakdown of the tissue (cartilage) on the underside of the kneecap (patella)."  See MedlinePlus, available at https://www.nlm.nih.gov/medlineplus/ency/article/000452.htm.

[4]  An osteochondrawl lesion is an injury to the talus (the bottom bone of the ankle joint) that involves both the bone and the overlying cartilage.  See FootCareMD, a service of the American Orthopaedic Foot & ankle Society, available at https://www.aofas.org/footcaremd/conditions/ailments-of-the-ankle/Pages/Osteochondral-Lesion .aspx.

examination of plaintiff's left knee was the same as his prior examinations. Id. 1062. Dr. Trapp examined plaintiff's right knee and observed a normal alignment and range of motion, no effusion, no bony tenderness to palpation, except tenderness over the medial and lateral joint lines, no swelling or tenderness of the prepatellar bursa except tenderness over the medial pes anserinus bursa, no crepitus, painful weight bearing, painless range of motion, normal strength and sensation, a positive patellar grind test and a positive McMurray's test[5]. R. 1063. Plaintiff was able to perform an active straight leg raise. R. 1063. Dr. Trapp recommended an MRI of plaintiff's knees. Id. On March 20, March 27, and April 3, 2009, Dr. Trapp observed similar findings as before, except that plaintiff presented with mild effusion in March, and the doctor administered synvisc injections to plaintiff's left knee. On April 3, 2009, Dr. Trapp noted that the MRI of plaintiff's left knee revealed "questionable medial meniscus tear and condromalcia," and the MRI of his right knee revealed "focal osteochondral lesion at medial margins of the patella." R. 1054.

On May 29, 2009, Dr. Trapp's examination revealed similar findings as in the past, except plaintiff experienced pain at extreme ranges of motion and his sensation had decreased. R. 1046. Plaintiff stated that his left knee did not feel as tight, but his leg was weak and giving way. Plaintiff complained of shooting pains down the leg, and noted that his right knee pain continued without change. Id. Plaintiff's right knee remained similar. R. 1047. Dr. Trapp noted that plaintiff had a limp. Id. Dr. Trapp examined plaintiff in July 24, 2009, September 18,

---

[5] During a McMurray's test, a patient lies on his back while the health care provider holds the heel of the injured leg with the leg bent. Pressure is placed to compress the knee while the leg is rotated in and out to generate discomfort or pain. Pain or a click over the inner part of the joint means an inner (medial) meniscal tear. See MedlinePlus, available at https://www.nlm.nih.gov/medlineplus/ency/article/001071.htm.

2009, January 15, 2010, and March 8, 2010, and made the same findings as before, except

plaintiff experienced painful weight bearing in the left knee, and painful and slightly decreased

range of motion in the right knee.  R. 1032-33, 1039-45.  On July 24, 2009, Dr. Trapp

recommended that plaintiff continue with his present care and take Flexeril[6].  R. 1045.  At a

follow-up on March 8, 2010, Dr. Trapp recommended Arthrotec[7] for four weeks and to start with

a repeat course of Synvisc[8] for both knees, noting that plaintiff "has had good response in the

past."  R. 1033.  On January 14, 2011, Dr. Trapp recommended that plaintiff continue with his

present care, and recorded that plaintiff noted no change in his pain.  R. 1016-17.  On September

23, 2013, plaintiff reported that his pain had greatly increased and that he developed an adverse

reaction to the Synvisc.  Dr. Trapp recommended not finishing the last injection and starting

Arthrotec injections.  R. 1021-22.  On July 14, 2011, Dr. Trapp recommended that plaintiff

continue with his present care of Arthrotec and Flexeril,  and noted that plaintiff has a 25% loss

of use in both knees, which was "clearly going to progress" and would "require further treatment

and surgery on the knees in the future."  R. 1006-07.  Plaintiff saw Dr. Trapp six times between

September 2010 and October 2012.  He reported "little difference after the [first] injections" at a

September 17, 2010 appointment, and greatly increased pain on September 23, 2010.  R. 1026-

---

[6] Flexeril is a muscle relaxant.  See MedlinePlus, available at
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

[7] Arthrotec is prescription medicine used to relieve pain and swelling. It is a nonsteroidal
anti-inflammatory drug (NSAID).  See MedlinePlus, available at
https://www.nlm.nih.gov/medlineplus/ency/article/002630.htm..

[8] Synvisc is a hyaluronic acid that may relieve the symptoms of osteoarthritis of the knee
for periods up to 6–12 months.  See American College of Rheumatology, available at
http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/Joint-Injection-Aspiration#
sthash.tZfwsuqO.dpuf,

31, 1021-22.  Plaintiff reported no change in his pain at his January 14, 2011, September 16, 2011, and April 27, 2012 appointments.  R. 1016-17, 1004-11, 996-99.  Dr. Trapp noted that the medicines continue to make a difference for plaintiff.  R. 996.  Plaintiff again noted no real changes in his pain on October 22, 2012, except that the weather makes his knees worse.  R. 1361-63.

Dr. Trapp opined that plaintiff was 100% or totally disabled for workers' compensation purposes on workers' compensation board forms on 1/2/09 (R. 498), 1/15/10 (R. 605-06), 2/13/09 (R. 491), 3/20/09 (R. 640), 3/27/09 (R. 485), 3/27/09 (R. 641), 5/29/09 (R. 636-37), 7/24/09 (R. 624-25), 7/24/09 (R. 618-19), 9/9/10 (R. 804-05), 9/17/10 (R. 802-03), 9/23/10 (R. 809-10), 9/23/10 (R. 800-01), 7/14/11 (R. 791-92), and 6/7/11 (R. 793-94).

2. <u>Dr. Pericles Gardianos</u>

In June and July 2009, Dr. Pericles Gardianos, plaintiff's chiropractor, also opined that plaintiff was totally disabled for workers' compensation purposes.  R. 583-84, 515-16.  On June 22, 2009, Dr. Gardianos wrote that he had been treating plaintiff for his work related injuries since August 19, 2005, and that plaintiff s' condition has become progressively worse since its onset.  R. 583.  Dr. Gardianos found that plaintiff had been totally disabled as of January 18, 2008, and noted that plaintiff reported difficulty climbing more than just a few stairs at a time, inability to sit or stand for prolonged periods of time, and inability to walk a short distance before exacerbation of his back pain.  R. 583-84.  Dr. Gardianos observed that plaintiff had an antalgic gait and limited trunk mobility, and noted that medication seems to decrease the spasms, but the pain and spasm returned after the medication wears off.  R. 583-84.  In a July 7, 2009 Workers' Compensation Board form, Dr. Gardianos opined that plaintiff had a 100 percent temporary impairment, based on his examinations on March 24, 2009 and June 16, 2009.  R.

515-16.

However, on Doctor's Narrative Reports for the Workers' Compensation Board dated on February 16 and June 13, 2011, Dr. Gardianos reported that plaintiff's complaints were not consistent with his history of injury, that it was unknown whether plaintiff's history of injury was consistent with Dr. Gardianos's objective findings, and that plaintiff had a zero percent temporary impairment. R. 779-80, 787-88.

     3.    <u>Dr. Elena Kaznatcheeva</u>

On June 12, 2008, plaintiff received a neurology consultation by Dr. Elena Kaznatcheeva, at Dr. Gardianos's referral, because of plaintiff's "intensive muscle spasm and back pain." R. 595. Plaintiff reported that his pain was getting significantly worse, that he had between 10 to 30 muscle spasms per day with "quite intense muscle spasm lasting along his spine," and that the pain was concentrated on his left side. He denied any numbness, tingling, or unstable gait. R. 595. Plaintiff said he was trying not to take medications but had experienced positive effects from ibuprofen and Flexeril. R. 595. Dr. Kaznatcheeva's neurological examination revealed that plaintiff had normal muscle bulk, strength, and tone, and that he demonstrated decreased muscle strength in the left leg. R. 597. Dr. Kaznatcheeva also observed that plaintiff's sensations were intact and that he was able to walk on toes, heels, and in tandem. R. 597. Dr. Kaznatcheeva recommended Ibuprofin and Flexeril. Dr. Kaznatcheeva referred plaintiff for thoracic and lumbar spine MRIs, which were completed on June 20, 2008. R. 461. Dr. Sherwin Pollock analyzed the MRI and found, with regard to the thoracic spine: 1) mild spondylotic change with Schmorl's nodes;[9] which was chronic in appearance; 2) no spinal

---

[9] A Schmorl's node is "an upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae." <u>See</u> <u>MedicineNet</u>, available at

stenosis; 3) no focal disc herniation; and 4) widely patent underlying spinal canal and neural

foramen. R 461. As for the lumbar spine, Dr. Pollock found: 1) a small disc bulge at the L5-S1

level, widely patent underlying spinal canal and neural foramen with indeterminate age of injury;

and 2) no focal disc herniations. R 462. On June 24, 2008, Dr. Kaznatcheeva reviewed

plaintiff's MRI results and opined that "[h]is MRI of the T-spine and LS spine was

unremarkable," aside from  "small disc bulge in the L5-S1" and mild spondylotic changes,"

noting that she could "barely . . . visualize L5-S1 central disc herniation." R 599. Dr.

Kaznatcheeva noted that there was no underlying pinsal canal or neuroforaminal narrowing and

the MRI was "otherwise unremarkable." R 599. Again, Dr. Kaznatcheeva observed that

plaintiff's muscle bulk, strength, and tone were normal, his sensations intact, and he was able to

walk on toes and heels and in tandem, but this time she observed that the diffuse weakness on his

left leg had improved. R. 600. Dr. Kaznatcheeva opined that "[f]rom [a] neurological point of

view, [plaintiff] can return to full duty." R. 600.

4.    Dr. Ranga Krishna

a.    Lower Back Pain

Later that summer, on August 18, 2008, plaintiff visited neurologist Ranga C. Krishna in

Brooklyn. An EMG/NCS (electromyography/ nerve conduction study) revealed chronic left L5-

S1 lumbo-sacral radiculopathy. R. 454. Dr. Krishna found that the "remainder of the lower

extremity muscles tested in the L4-S1 myotomes were normal." R. 454. Dr. Krishna advised

plaintiff to "refrain from physical strenuous activities, i.e. heavy lifting, bending, prolonged

sitting, [and] prolonged sitting and standing." R. 454. The following year, on August 15, 2009,

--------------------------------

http://www.medicinenet.com/script/main/art.asp?articlekey=14007.

Dr. Krishna conducted another EMG/NCS test, which revealed "evidence of left C5-C6 cervical and left L5 S1 lumbosacral radiculopathies," as well as "a moderate bilateral sensorimotor median nerve neuropathy at the wrist . . . consistent with the clinical diagnoses of Carpal Tunnel Syndrome." R. 504. Dr. Krishna recommended that plaintiff restrict his physical activity and avoid prolonged standing, walking, or sitting.

Dr. Krishna's notes from plaintiff's appointments from September 13, 2008 through July 9, 2012[10] indicate that plaintiff continued to complain of low back pain and difficulty walking, bending, and negotiating stairs. R. 452, 450, 560, 496, 488-90, 549, 514, 542, 523, 895, 900, 847-49, 1100-02. Dr. Krishna found that plaintiff's lumbar radiculopathy was worsening, but Dr. Krishna's examination findings remained similar throughout this time period. Id. Dr. Krishna consistently observed that plaintiff had tenderness on palpation and positive paravertebral trigger points along the lumbar spine, numbness in the legs bilaterally, and difficulty walking and negotiating stairs, that plaintiff's lower back pain exacerbated on lateral flexion, extension, and Valsalva type of maneuvers[11], and that the lumbar pain radiated to the buttocks and lateral aspects of plaintiff's legs, with tingling in the legs and occasional numbness in his feet. Id.

A March 7, 2009 neurological consultation revealed that plaintiff's low back pain had

-------------------

[10] Dr. Krishna saw plaintiff on September 13, 2008, October 11, 2008, January 10, 2009, February 10, 2009, March 7, 2009, May 16, 2009, June 13, 2009, July 18, 2009, January 23, 2010, January 17, 2011, July 9, 2011, and July 9, 2012.

[11] "This is a simple test for the part of [the] nervous system that controls functions such as [the] heartbeat and the narrowing and widening of [the] blood vessels. . . . During this test, [the patient] take[s] a deep breath and then force[s] the air out through [the] lips . . . several times. [The] heart rate and blood pressure will be checked during the test." See National Institute of Health National Heart, Lung, and Blood Institute, available at http://www.nhlbi.nih.gov/health/health-topics/topics/hyp/diagnosis.

intensified and radiates into both legs.  Plaintiff reported difficulty performing repetitive tasks

such as bending, pushing, and pulling, and sought epidural injections.  Dr. Krishna observed that

plaintiff had normal power, bulk, and tone in most muscle groups with "4/5 weakness in the

EHL, TA, GM muscles on the bilateral side," normal cervical range of motion, decreased lumbar

range of motion,, and normal sensory thresholds except for decreased sensation on the outer

aspect of the bilateral leg to pin, and normal deep tendon reflexes, except for the bilateral ankle

jerk.  R. 489.

Throughout this period, Dr. Krishna prescribed Relafen and Flexerin, and advised

plaintiff to continue physical therapy. Dr. Krishna also administered nerve blocking injections

and noted that plaintiff "tolerated the procedure well, with no complications and good pain

relief."  Id.

On February 21, 2011, Dr. Krishna examined plaintiff and noted that, while plaintiff was

"on a stable dose of medications for the back complaints," plaintiff experienced bilateral hand

numbness which "seems to be at times unbearable."  R. 898.  Dr. Krishna noted that plaintiff's

"upper extremity complaints are consistent with bilateral carpal tunnel syndrome . . . possibly

secondary to chronic repetitive strain injury process while working."  Id.  Dr. Krishna

recommended that plaintiff would benefit from wrist splints and hand surgical consultation if the

splints fail. R. 899.  Plaintiff had a Tinel's sign[12] at the wrist.  R. 900.  Electrodiagnostic studies

on February 21, 2011, July 1, 2011, and May 12, 2012 revealed evidence of a mild to moderate

bilateral sensorimotor median nerve neuropathy at the wrist, which is consistent with Carpal

_____

[12] Tinel's sign is a shooting pain from wrist to hand caused by tapping over the median
nerve at the wrist.  See MedlinePlus, available at
https://www.nlm.nih.gov/medlineplus/ency/article/000433.htm.

Tunnel Syndrome.  R. 902, 1114.  The February 2011 study revealed that the neuropathy was greater in the right than the left.  R. 902.  Dr. Krishna opined on July 9, 2011 that plaintiff's complaints were consistent with a "repetitive strain injury from working overtime to his hands resulting in carpal tunnel syndrome." R. 849.  On January 14, 2012 Dr. Krishna noted plaintiff's Tinel's sign and diagnosed plaintiff with post traumatic Right Carpal Tunnel Syndrome, and on July 9, 2012, noted that his pain "result[ed] from an industrial event of July 9, 2011." R. 843, 1101.  On August 6, 2011, Dr. Krishna recommended that plaintiff continue to wear a split on his right write and continue his current treatment for his right Carpal Tunnel Syndrome.  R. 1119.

On February 16, 2010, Dr. Krishna completed a Physical Residual Functional Capacity Questionnaire for plaintiff.  He diagnosed plaintiff with cervical and lumbosacral radiculopathy and considered his prognosis guarded.  R. 586.  He indicated that plaintiff had a marked limitation to deal with work stress, that plaintiff could walk ½ city block with rest, sit for 20 minutes, stand for 20 minutes, sit and stand/walk for less than 2 hours total in an 8 hour working day, with normal breaks, and would need to walk for 15 minutes every 30 minutes in an eight hour working day.  Dr. Krishna opined that plaintiff would need a job which permits shifting positions at will and would need unscheduled breaks every 20 minutes for 30 minutes.  R. 588.  According to Dr. Krishna, plaintiff's legs should be elevated at 90 degrees for 60% of the time during an 8 hour sedentary job.  R. 589.  Dr. Krishna opined that plaintiff must use a cane, that plaintiff can lift and carry less than ten pounds occasionally in a competitive work situation but would never be able to lift and carry 10, 20, or 50 pounds.  Dr. Krishna reported that plaintiff has significant limitations in doing repetitive reaching, and could use his arms for reaching 5-10% of the time.  R. 590.  Dr. Krishna noted that plaintiff can bend and twist at the waist less than 5% of

an 8 hour day, and that plaintiff's impairments would cause him to be absent from work more than three times per month.  R 590.

On July 9, 2012, Dr. Krishna submitted a Doctor's Report of MMI/ Permanent Impairment to the State of New York Workers' Compensation Board.  R. 840-42.  When checking whether plaintiff could constantly, frequently, occasionally, or never perform various residual functional activities, Dr. Krishna indicated that plaintiff could never perform lifting/carrying, pulling/pushing, climbing, kneeling, bending/stooping/squatting, simple grasping, fine manipulation, reaching overhead, reaching at/below shoulder level, or operating machinery.  R. 842.  Dr. Krishna also noted that plaintiff could never be exposed to extreme temperature or high humidity or environmental factors.  Id.  Dr. Krishna indicated that plaintiff could occasionally sit, stand, walk, and drive a vehicle.  Id.  Dr. Krishna wrote that plaintiff was unfit for using both hands functionally that his pain medicines may cause drowsiness, and that plaintiff has weak grasp in both hands which impacts his activities of daily living.  R. 842.

Dr. Krishna consistently indicated that plaintiff was totally disabled on a number of other Workers' Compensation Board Forms from August 26, 2008 through January 16, 2012, and noted a 75% temporary impairment on November 16, 2009.  R. 448-49, 451, 453, 459, 484, 487, 495, 497, 499-502, 509-10, 512-13, 124-27, 530-31, 540-41, 545-4, 548, 564, 813-25, 845-46, 854-55, 857-61, 873-74, 879-82, 887-88, 896-97, 906-09, 920-21, 926-33.

5.   Drs. Ramzi Tawil and Laurence Tawil

On February 4, 2010, plaintiff obtained a Comprehensive Medical Exam with Dr. Laurence Tawil for the purpose of establishing care.  R. 1036.  A review of plaintiff's musculoskeletal system revealed "no joint pain or swelling; no weakness; normal gait."  R. 1037. Upon physical exam, plaintiff exhibited "normal musculature" without "skeletal tenderness or

joint deformity" and his "extremities appear[ed] normal" without edema or cyanosis.  R. 1037.

A March 8, 2010 Office Visit to Dr. Laurence Tawil again contained no mention of plaintiff's knee, back, or hand pain, and the musculoskeletal and extremity physical exam were normal.  R. 1034-35.

On September 21, 2010 plaintiff reported to Dr. Laurence Tawil that he had severe knee pain that radiated into his hamstring.  R. 1023.  As with plaintiff's previous exams, plaintiff's extremities appeared normal and free of edema or cyanosis.  R. 1024.  There is no mention of plaintiff's hand pain.  R. 1023-25.

On January 19, 2011, plaintiff reported to Dr. Ramzi Tawil that he had a history of chronic knee pain, that he had right foot pain, and thinks he may have gout.  R. 1014.  He had "no swelling, no ankle pain, or any other joint [sic] pain."  R. 1014.  Dr. Tawil specifically noted that plaintiff was negative for back pain.  R. 1014.  Plaintiff reported pain in his right great toe, but Dr. Tawil noted no skeletal tenderness or deformity.  R. 1014-15.

At Office Visits to Dr. Ramzi Tawil on January 28, 2011 and November 9, 2011, Dr. Tawil noted that plaintiff had "no joint pain or swelling; no weakness; normal gait."  R. 1012, 1003."  Upon examination of plaintiff's extremities, Dr. Tawil noted that plaintiff's "extremities appear normal" and plaintiff and "no edema or cyanosis."  R 1013, 1003.  In January, plaintiff's physical exam revealed "no apparent distress."  R. 1012.

Dr. Ramzi Tawil completed a Comprehensive Medical Examination of Plaintiff on December 13, 2011, during which he again found that plaintiff had "[n]o joint pain or swelling; no weakness; normal gait" and noted that a physical exam revealed "no apparent distress."  R. 1000-01.  Plaintiff showed "normal musculature[,] no skeletal tenderness or joint deformity," and again, his "[e]xtremities appear normal" with "no edema or cyanosis."  R. 1001.  Dr. Tawil

assessed, based on plaintiff's comprehensive exam, that plaintiff was "doing well today" and had "no concerns." R. 1001. Dr. Tawil filled out the paperwork for the Department of Transportation. R. 1001. According to Dr. Tawil's notes, plaintiff did not complain of any chronic problems other than hypertension. Plaintiff did not complain of any hand pain whatsoever. Dr. Tawil's notes from this examination do not mention any of the complaints that plaintiff had made to his other doctors for purposes of Workers' Compensation around that time.

D.    Workers' Compensation Sources

    1.    Dr. David Wellin

On October 10, 2008, Dr. David Wellin, another physician from Industrial Medicine Associates PC, examined plaintiff and reviewed treatment records for Workers' Compensation. R. 642-45. Dr. Wellin had previously examined plaintiff on March 21, 2007 after plaintiff's December 2006 left knee injury. R. 642. At the October 10, 2008 visit, plaintiff complained of left knee stiffness and episodes of momentary instability approximately once per week, and of mid back pain that radiates and left-sided mid back muscle spasms. R. 643. Plaintiff denied any numbness or tingling in the distal extremities. R. 643. Upon examination, Dr. Wellin found that plaintiff ambulated without a noticeable limp and that he was able to toe and heel walk and squat. R. 643. Dr. Wellin's examination of plaintiff's back revealed tenderness, muscle spasm, and restricted range of motion. R. 643-44. Aside from some decreased sensation on the left side, plaintiff's neurologic examination was normal. R. 644. Dr. Wellin examined plaintiff's left knee, and found no effusion, mild tenderness, limited flexion, and pain without clicking. R. 644. Dr. Wellin's diagnosis included residual symptoms of instability on plaintiff's left knee, and thoracic spine strain; he recommended physical therapy for plaintiff's back and a reevaluation of plaintiff's left knee. R. 644.

Dr. Wellin examined plaintiff again on June 10, 2011.  R. 830-33.  Plaintiff complained that, since his previous examination, his back symptoms continued and he injured his right knee. R. 830.  Plaintiff complained that he had constant back pain, which he rated 4 to 8 out of ten, with radiation, numbness, and tingling down his left leg.  His left knee caused intermittent pain that increased with prolonged sitting or standing, stairs, or with weather changes.  R. 830. Plaintiff reported that his right knee symptoms were similar to his left but with lesser intensity. R. 830.  As Dr. Wellin found in the previous exam, plaintiff did not have a noticeable limp, he could both toe and heel walk, had mild back tenderness and decreased range of motion, and his lower extremities were normal aside from some decreased sensation on the left.  R. 831.  At this visit, Dr. Wellin found that plaintiff was unable to squat and that he had tenderness and decreased range of motion in his knees, but that his knees had no effusion or instability.  R. 831-32.  Dr. Wellin opined that plaintiff had a moderate partial disability due to his back condition, as well as a moderate partial disability due to his bilateral knee condition, resulting in an overall marked disability of 75% due to his work injuries.  R. 832.  Dr. Wellin opined that plaintiff should not be involved in work activities requiring him to lift or carry objects greater than 25 pounds or in which he needs to crawl, climb, kneel, run, or restrain combative inmates. Dr. Wellin opined that plaintiff would not return to work as a corrections officer.

Dr. Wellin re-examined plaintiff on January 18, 2013 and noted that since his last report, plaintiff had continued symptoms of both knees and was told of the eventual need for bilateral total knee replacement.  R. 1379.  Plaintiff complained of constant back pain with radiation to the left leg as well as numbness and tingling of the left leg, and intermittent pain in both knees which worsened with prolonged sitting, standing, stairs, or weather changes.  R. 1379.  Plaintiff ambulated with a mild left-sided limp, and was able to both toe and heel walk, but was unable to

-16-

squat. R. 1380. An examination of plaintiff's back revealed mild to moderate tenderness, greater on the left than on the right, and limited range of motion. R. 1381. Plaintiff's neurological examination in the lower extremities revealed normal deep tendon reflexes, normal muscle strength in all muscle groups, and intact sensation of the lower extremities. Id. In his knees, plaintiff had no effusion, no instability, decreased ranges of motion, and some tenderness. Id. Dr. Wellin opined that plaintiff had a progressive and severe painful condition of both knees, and concluded that he had a permanent partial disability and was suited for sedentary-type work only. Id. On January 29, 2013, Dr. Wellin completed an Impairment Classification Exam for plaintiff, and opined that plaintiff could never climb, kneel, bend/stoop/squat, or operate machinery, that he could occasionally stand, walk, and drive a vehicle, frequently lift/carry and pull/push ten pounds and sit, and that he could constantly perform simple grasping, fine manipulation, reaching overhead, and reaching at/or below shoulder level. R. 1383.

Dr. Wellin checked the "Sedentary Work" box for plaintiff's exertional ability, which described the work as "exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body . . . sitting most of the time, but may involve walking or standing for brief periods of time," and explains that a job is sedentary "if walking and standing are required only occasionally and all other sedentary criteria are met." R. 1384.

2.    Dr. David Tucker

On September 17, 2009, Dr. David Tucker of Industrial Medicine Associates examined plaintiff's back and knees for Workers' Compensation. R. 612-17. Plaintiff complained of mid to low back pain, right knee pain that was intermittently sharp and dull with intermittent swelling, intermittent left knee pain with episodes of giving way, and a dull, aching discomfort.

R. 612.  Dr. Tucker reviewed Dr. Trapp's note and C4 form and previous IME reports.  R. 613.

Upon examination of plaintiff's cervical spine, Dr. Tucker found that plaintiff had mild

tenderness to palpation in the left side of his neck, no spasm, and good range of motion.  Id.  He

found tenderness in the left paraspinal muscle region, no tenderness over the spinous processes,

and limited range of motion.  Id.  Plaintiff's upper extremities had no joint swelling, gross

limitation of joint motion, or any neurovascular deficits, although plaintiff complained of back

and neck pain when he elevated his shoulders above 150 degrees.  Id.  Plaintiff had tenderness

and limited ranges of motion in his knees and a 3/4" atrophy on his left thigh compared to the

right, but no instability or limp, or problems with his hips, ankles, or feet. R. 614.

    3.    <u>Dr. Robert Pearl</u>

    Plaintiff obtained an independent chiropractic reexamination for workers' compensation

purposes from Dr. Robert M. Pearl on April 16, 2010.  Plaintiff complained of low back pain

with radiation of pain down his entire left leg to the foot with associated numbness, and that he

recently developed left arm numbness and pain.  R. 1376.  Dr. Pearl's low back exam revealed

decreased range of motion on flexion, extension, and rotation.  Id.  He noted spasm in the

paraspinal musculature and decreased sensation in the left thigh as compared to the right.  R.

1376-77.  Overall, Dr. Pearl opined that plaintiff had a moderate/marked disability and that his

conditions had gotten worse since the last time Dr. Pearl saw Plaintiff.  Dr. Pearl suggested that

plaintiff continue chiropractic care, which plaintiff reported was "somewhat helpful

symptomatically but . . . not curative."  R. 1377.  Dr. Pearl opined that plaintiff's lifting

limitation was 15 pounds, that plaintiff was not capable of repetitive bending or restraining

patients, and that maximum medical improvement had been achieved for active chiropractic

care.  Id.

On September 24, 2010, Dr. Pearl reexamined plaintiff, who complained of constant low back pain varying in intensity, with radiation of pain down the posterior left leg, and bilateral knee pain.  R. 1311-12.  Dr. Pearl's findings in September were similar to his April findings.  Dr. Pearl diagnosed plaintiff with a permanent/chronic disability and a poor prognosis.  He opined that plaintiff could not return to work as a corrections officer, but that plaintiff could continuously sit, stand, and walk for three hours in an eight-hour workday, and sit, stand, and/or walk in combination a total of 8 hours in a workday, and that plaintiff was able to perform simple grasping, pushing and pulling, and fine manipulation with both hands, and use both legs simultaneously for repetitive movement, such as the operation of foot controls or motor vehicles.  R. 1315.  Dr. Pearl opined that plaintiff could frequently lift and carry up to 20 pounds, occasionally lift and carry 50 pounds, and never lift or carry over 50 pounds.  Plaintiff could occasionally bend, but never squat, crawl, climb, or run.  Plaintiff could frequently reach above shoulder level and operate a motor vehicle.  Dr. Pearl opined that plaintiff could be exposed to marked changes in temperature and humidity, be exposed to unprotected heights, and be around moving machinery, but that he could not restrain combative clients. R. 1315.

   4.   Dr. Howard Levin

On October 4, 2011, plaintiff saw orthopedic surgeon Dr. Howard Levin for a workers' compensation evaluation.  1370-72.  Dr. Levin's physical examination of plaintiff revealed no areas of wrist tenderness, mildly positive Phalen's sign[13] on both rights and positive Tinels' sign at the left carpal tunnel.  R. 1371.  Dr. Levin diagnosed plaintiff with bilateral carpal tunnel

_____

   [13]  Phalen's sign is numbness, tingling, or weakness as a result of bending one's wrist forward all the way for 60 seconds.  See MedlinePlus, available at https://www.nlm.nih.gov/medlineplus/ency/article/000433.htm.

syndrome, by EMG, milder on the right than the left.  Plaintiff did not need facility-based

physical or occupational therapy or surgery.  R. 1372.

On January 30, 2013, Dr. Levin reevaluated plaintiff.  R. 1385.  Dr. Levin noted that

plaintiff reported that his activities of daily living consist of staying at home, and that plaintiff

stated "that he had to repair his furnace and a light-bulb exploded in his hand, which accounts

for the dirt on his fingers and the multiple cuts on his hands."  R. 1386.  Plaintiff had a good grip

strength and Dr. Levin's sensory examination of plaintiff's fingers was normal.  Id.  Dr. Levin's

examination of plaintiff's wrists revealed no areas of tenderness, normal ranges of motion,

mildly positive Tinel's sign at the carpal tunnel, and mildly positive Phalen's sign.  R. 1387.  Dr.

Levin diagnosed plaintiff with mild carpal tunnel syndrome bilaterally, and commented that,

although a median nerve carpal tunnel, without decompression, is usually given a schedule loss

of use of the hand that average ten to twenty percent according to the New York State Workers'

Compensation *Medical Guidelines*, "in view of the fact that [plaintiff] reports that he was able to

repair his furnace, which obviously requires use of the hands, . . . there is a schedule loss of use

of the hands of five percent."  Id.

E.    Consultative Examinations

1.    Dr. Steven Rocker

Dr. Steven Rocker performed an internal medicine examination of plaintiff on January 5,

2009.  R. 463.  Plaintiff's chief complaint was his constant low back pain and knee injury, which

exacerbated his low back pain.  Plaintiff reported that he lives with his parents and is

independent in activities of daily living, though his pain limits his ability to perform household

chores.  Dr. Rocker observed that plaintiff had a normal stance, a minimal limp, and did not need

any help changing for the exam, getting on and off the exam table, rising from a chair, or sitting

up from a lying position.  R. 464.  Plaintiff's squat was subjectively 30% of full.  Id.  The range

of motion of his lumbosacral spine was limited to 60 degrees forward flexion, full right and left

lateral rotation, and full right and left rotation, and his straight leg raising test bilaterally elicited

low back pain without radicular symptoms.  His cervical spine showed full range of motion, and

he showed no abnormality in the thoracic spine.  Plaintiff had full range of motion of his

shoulders, elbows, forearms, wrists, hips, knees, and ankles.  R. 465.  His upper extremities had

full strength and his joints were stable and non-tender, and lacking any redness, heat, swelling,

or effusion.  Id.  Plaintiff's neurologic exam revealed no motor or sensory deficit, and his

extremities and fine motor activity of hands were normal.  Dr. Rocker diagnosed plaintiff with

arthralgia/myalgia of low back and arthralgia of the left knee, and gave him a fair prognosis.  R.

465-66.  Dr. Rocker's medical source statement was that plaintiff had no sitting or handling

limitations and that he had a mild to moderate limitation for standing, walking, lifting, and

carrying.  R. 466.

      2.    <u>Dr. S. Putcha</u>

On January 15, 2009, Dr. S. Putcha completed a Physical Residual Functional Capacity

Assessment and diagnosed plaintiff with low lumbar disk disease and mild arthritis of the left

knee, and mild obesity.  He opined that plaintiff could occasionally lift and/or carry twenty

pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks for about 6

hours in an 8 hour workday, sit with normal breaks for about 6 hours in an 8 hour workday, and

that he was unlimited in his ability to push and/or pull, including operation of hand and/or foot

controls, other than his lifting and carrying limitations.  R. 469-70.  Dr. Putcha opined that

plaintiff could occasionally perform climbing a ramp/stairs and a ladder/rope/scaffolds,

balancing, stooping, keeling, crouching, and crawling.  R. 470.  Dr. Putcha found that plaintiff

had no manipulative, visual, communicative, or environmental limitations.  R. 470-71.

According to Dr. Putcha, plaintiff's symptoms were partly credible, his impairment was not at a

listing level, and he had a residual functional capacity for light work.  R. 471.

F.       Plaintiff's Hearing Testimony

   1.       First Hearing on March 19, 2010

   At the time of the hearing, plaintiff lived upstairs from his parents in a two family

dwelling, with his significant other and her two children.  R. 46.  He was born on December 12,

1968 and completed high school.  R. 43, 338.  He received some college credits when he served

in the Air Force, from which discharged after serving for 31 days.  R. 43-44.  For the fifteen

years prior to the onset date, plaintiff worked primarily as a corrections officer at Wallkill

Correctional, and also spent some time working at Sing-Sing Correctional Facility in Ossining

and as an instructor for the Department of Corrections.  R. 47-48.

   Plaintiff testified about the arthroscopic surgery on his left knee, his right knee issues,

and his back spasms.  R. 48.  He testified that his muscle spasms vary and that "some days are

better, some days are worse."  R. 49.  In response to the ALJ's question about what would

aggravate his back, plaintiff said "trying to lift . . . laundry . . . can't grocery shop . . . lifting,

lifting heavier weights.  I have trouble with a gallon of milk . . . some days it affects me more

than others."  R. 50.  He testified that medication dulls his pain, but he could not answer how

long the medication lasts.  R. 50.  Without medication, plaintiff rated his pain as an eight out of

ten.  R. 51.  Although medication may reduce his pain to a six out of ten, the medication gives

him stomach pain and makes him groggy.  R. 51.

   Plaintiff testified that he drove himself to the hearing, which took 35 minutes.  R. 53.  He

feels varying degrees of pain, all the time in his back, and the muscle spasms go down his leg

and create pain in his hands, arms, and knees.  R. 53.  When his partner's children are in school, plaintiff does limited chores around the house, such as dishes, cleaning up, and sweeping.  R. 56.

Plaintiff testified that he travels approximately an hour and a half, and approximately 98 to 110 miles, to see Dr. Krishna in Brooklyn from his home in Pine Bush, New York.  R. 56-57. He tries to carpool with another patient of Dr. Krishna who lives in Newburgh.  R. 57.   The ALJ inquired why plaintiff chooses to see a doctor closer to him, and plaintiff explained that his previous neurologist, Dr. Kaznatcheeva, doubted his pain and a friend referred him to Dr. Krishna.  R. 58.

Plaintiff testified that he has numbness and tingling in his hands sometimes, primarily in his left hand.  R. 61.  He used to engage in fishing, hunting, and riding ATVs on his family farm, but testified that he is no longer able to do so and had not driven an ATV in two years.  R. 61. He checks email every couple of days and is able to cook on a more limited basis than before his injuries.  Plaintiff's hand issues were primarily treated by Dr. Krishna, although Dr. Krishna did not recommend any physical therapy or carpal tunnel release.  R. 62.  Throughout the hearing, plaintiff stood up because he was uncomfortable staying in the same position.  R. 62-63.  He testified that when he goes to Brooklyn, he prefers to be a passenger in the car so that he can move and stretch a bit.  R. 64-65.

2.   Second Hearing on January 8, 2013

After the Appeals' Council remanded the case to the ALJ, plaintiff testified again on January 8, 2013.  Plaintiff testified that he held a Class A commercial driver's license since he was young.  R. 77.  In order to get the obtain the license, plaintiff was examined by his family physician, Dr. Tawil, who plaintiff claims asked him some questions and took a urine sample. Id.

Plaintiff testified that he had carpal tunnel syndrome since 2004, but he did not realize what it was until after 2009, when he experienced severe numbness and tingling of his hands and loss of dexterity.  R. 79.  Plaintiff testified that he sought treatment with Dr. Krishna in Brooklyn, approximately 220 miles and 3 hours away, round trip.  R. 79.  When asked why plaintiff chose to see a doctor so far away, plaintiff replied that he does not "trust [his] health to just anybody" and that he had "heard a lot of horror stories about doctors in the area."  R. 80. Plaintiff testified that he received just over $1,800 per month in disability retirement payment from the Corrections' Department, and just over $1,700 per month from worker's compensation. R. 81.

Plaintiff testified that traveled on an airplane to Colorado in April of 2012 because his aunt was sick and passed away.  R. 88-89.  Plaintiff also flew to Florida to address some family issues with his significant other.  R. 89.  Plaintiff also flew to Louisiana in late 2011 to visit his uncle. 89-90.

The ALJ asked plaintiff questions regarding Dr. Krishna's note that plaintiff's carpal tunnel started around 2004 from work and was classified as "post-traumatic carpal tunnel syndrome," in January 2011, even though plaintiff has not been working since 2008.  R. 90-91. The ALJ asked how plaintiff is still getting treatment in 2013, even though he had not worked since 2008.  R. 91.  Plaintiff explained that his carpal tunnel syndrome was "occupational" and "something that onsets over time."  R. 91.  Plaintiff's attorney explained that the Workers' Compensation Board established the injury as an occupational injury in 2011, although plaintiff had not worked since 2008.  R. 91.

Plaintiff explained that on an average day, he is housebound.  R. 94.  When it snowed a couple of weeks before the hearing, plaintiff's brother dealt with the snow.  Id.  Carrying objects

is difficult for plaintiff and he has lost a lot of dexterity in his hands.  R. 95-96.  Plaintiff's

brother and nephews also help with whatever needs to be done that plaintiff cannot handle, such

has mowing the lawn, shoveling snow, taking care of plaintiff's dog, and doing heavy lifting.  R.

96-97.  Plaintiff testified that he sometimes has a hard time lifting a full gallon of milk.  R. 97.

Plaintiff testified that he had physical therapy for the carpal tunnel, in 2010, but it did not

help him. 100-01.  He experiences hand numbness every day, which makes it difficult for him to

write and hold onto things.  R. 101.  He does not use a computer often, because it exacerbates his

condition.  R. 101-02.  His touch screen cell phone requires use of his finger to manipulate.  R.

102.

Plaintiff testified that he experienced back pain in his mid to low back, which radiates to

his lower leg.  R. 102-03.  He also suffers from muscle tightness in his neck. R. 102-04.  When

plaintiff sits with his legs bent at the knee, he experiences tightness and numbness in his leg; at

the hearing, plaintiff sat with his leg out.  R. 103.  Plaintiff testified that he has to change

positions from sitting or standing every ten minutes, that he feel unstable holding a gallon of

milk, and that his knees are in constant pain.  R. 104-05.  Plaintiff takes sleep medication when

he flies.  R. 105.  Plaintiff walks with a limp.  R. 106.  He used to tie flies for fishing, but lost the

manual dexterity to do so.  Id.

Plaintiff testified that he has his hunting license, which he gets every year and includes a

fishing license.  R. 106.  He testified that he had already gone hunting one day that year, and that

he has hunted between 6-12 times since 2008 with a rifle near his house, and he has gone fishing

approximately the same number of times.  R. 107-08.  Plaintiff testified that he does not actively

participate in any other hobbies or organizations.  R. 108-09.

Plaintiff takes Vicodin at least twice per day.  He drives an automatic car, a Toyota

Tundra, which he drove about twenty minutes to the hearing office.  R. 110.

3.   Third Hearing on February 22, 2013

The ALJ reconvened the hearing on February 22, 2013 in order to receive testimony from Vocational Expert Raymond Cestar.  R. 117.

At the hearing, plaintiff testified that his January 30, 2013 appointment with Dr. Levin lasted only one minute and 37 seconds, and that Dr. Levin's description of their conversation about working on the furnace was inaccurate.  R. 119.  Plaintiff testified that when Dr. Levin saw burns on plaintiff's hands, plaintiff told Dr. Levin that he had attempted to shut off the emergency shutoff switch to see what was wrong with the furnace to inform his plumber, and a light bulb exploded and two shards of glass fell on his head and burned his hand.  Id.  Plaintiff testified that Dr. Levin never physically touched plaintiff's hands or examined them.  R. 120. The Administrative Law Judge observed plaintiff's hands and said that plaintiff still had a visible burn on his right hand, above his thumb.  R. 119.  Plaintiff testified that when he received a copy of the incorrect report, he called a representative at the doctor's office but did not file any complaints.  R. 122.

G.   Vocational Expert Mr. Cestar

At the February 22, 2013 hearing Vocational Expert Raymond Cestar testified.  R. 125-39.  The ALJ asked Mr. Cestar to opine on hypothetical questions regarding a person of plaintiff's age, education, and work history.  First, Mr. Cestar opined that a person with a residual functional capacity for a limited range of sedentary work, who can frequently reach overhead bilaterally, frequently handle and finger bilaterally, occasionally kneel, crouch, stoop, and climb stairs, but never crawl or climb ladders, ropes, or scaffolds could not do any of plaintiff's past work.  R. 127.  Mr. Cestar opined that such a hypothetical person, however, could

be a clerical worker, a charge account clerk, or an order clerk.  R. 127-28.  Second, Mr. Cestar

opined that, if such a hypothetical person additionally needed a sit/stand option every two hours

and would not be able to crouch or kneel, that person could work as a clerical worker, charge

account clerk, order clerk, surveillance system monitor, or an assembler.  R. 129-31.   Third, Mr.

Cestar opined that if the same hypothetical person could only perform occasional fingering and

handling, that person would not be able to do any of the jobs of the previous two hypothetical

people.  R. 132.  Fourth, Mr. Cestar opined that if the person required a fifteen minute walk

break every thirty minutes, that person would not be able to perform at a persistent pace, and

would not be able to perform any job in the national economy. 132-34.  Lastly, Mr. Cestar

opined that if the person required missing more than three days of work per month because of

bad days due to his medical conditions, that person would not be able to perform any job.  R.

134.

## III.  LEGAL STANDARDS

A.      <u>Standard of Review</u>

In reviewing a decision of the Commissioner, a district court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without remanding the cause for a

rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo*

whether a claimant was disabled."  <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999).  Rather,

the court's review is limited to "'determin[ing] whether there is substantial evidence supporting

the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"

<u>Poupore v. Astrue</u>, 566 F.3d 303, 305 (2d Cir. 2009) (quoting <u>Machadio v. Apfel</u>, 276 F.3d 103,

108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Social Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lamay v. Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted).  "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted.  Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.     Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In addition, a person is eligible for disability benefits under the SSA only if

his physical or mental impairment or impairments are of such severity that he is

-28-

not only unable to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind of substantial gainful
work which exists in the national economy, regardless of whether such work
exists in the immediate area in which he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step

sequential analysis:

1.   The Commissioner considers whether the claimant is currently engaged in
substantial gainful activity.

2.   If not, the Commissioner considers whether the claimant has a "severe
impairment" which limits his or her mental or physical ability to do basic
work activities.

3.   If the claimant has a "severe impairment," the Commissioner must ask
whether, based solely on medical evidence, claimant has an impairment
listed in Appendix 1 of the regulations.  If the claimant has one of these
enumerated impairments, the Commissioner will automatically consider
him disabled, without considering vocational factors such as age,
education, and work experience.

4.   If the impairment is not "listed" in the regulations, the Commissioner then
asks whether, despite the claimant's severe impairment, he or she has
residual functional capacity to perform his or her past work.

5.   If the claimant is unable to perform his or her past work, the
Commissioner then determines whether there is other work which the
claimant could perform.

Rolon v. Commissioner of Soc. Sec., No. 12 Civ. 4808, 2014 WL 241305, at *6 (S.D.N.Y. Jan.

22, 2014); see 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the

burden of proof as to the first four steps of the process.  See Green-Younger v. Barnhart, 335

F.3d 99, 106 (2d Cir. 2003).  If the claimant proves that his impairment prevents him from

performing his past work, the burden shifts to the Commissioner at the fifth and final step.  See

id.; 20 C.F.R. § 404.1560(c)(2).  At the fifth step, the Commissioner must prove that the

claimant is capable of obtaining substantial gainful employment in the national economy.  See

Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV.  THE ALJ'S DECISION

The ALJ properly applied the five-step sequential analysis described above and

concluded that plaintiff was not disabled under the meaning of the SSA.  R. 13-29.  At step one,

the ALJ determined that plaintiff had not engaged in substantial gainful activity during the

relevant time period.  R. 15.  At step two, the ALJ concluded that plaintiff's bilateral carpal

tunnel syndrome (CTS), hypertension, chondromalacia of the left knee, right knee pain, obesity,

chronic pain syndrome, lumbago, lumbar spine radiculopathy, thoracalgia, thoracic spine strain

and herniation, and cervical radiculopathy constituted "severe impairments" within the meaning

of the SSA.  Id.  At step three, the ALJ determined that plaintiff's impairments (individually or

combined) did not meet or medically equal the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1.  R. 15-16.  Next, the ALJ determined that plaintiff had

the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR

404.1567(a) except that he is limited to frequent fingering and handling bilaterally; he can

frequently reach overhead with the bilateral upper extremities; and he can occasionally climb

stairs and stoop.  He is precluded from crouching, kneeling, crawling and climbing ropes,

ladders or scaffolds.  The claimant also required a sit/stand option once every two hours."  R. 16.

At step four, the ALJ determined that plaintiff "is unable to perform any past relevant

work."  R. 28.  At step five, the ALJ determined that transferability of job skills is not material to

the determination of disability because using the Medical-Vocational Rules as a framework

supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable

job skills (See SSR 82-41 and 20 CFR Part P, Appendix 2)," and thus "considering the

claimant's age, education, work experience, and residual functional capacity, there were jobs

that existed in significant numbers in the national economy that the claimant could have

performed (20 CFR 404.1569 and 404.1569(a))."  R. 28.  The ALJ concluded that plaintiff had

not been "disabled" under the SSA.  R. 29.

## V.  ASSESSING THE ALJ'S FINDINGS

Plaintiff's Preliminary Statement challenges the Commissioner's decision on three

grounds: (1) the ALJ's decision is not supported by substantial evidence; (2) the ALJ's decision

is contrary to the law; and (3) Plaintiff did not have a full and fair hearing.  Plaintiff's

Memorandum of Law in Support of his Motion for Judgment on the Pleadings ("Pl. Mem.") at 1-

2.  The substance of plaintiff's argument does not track these claims, however.  Rather,

plaintiff's brief states:

> The Administrative Law Judge's RFC did not properly include limitations
> regarding the plaintiff's ability to grasp, finger and reach.  Further, it did not
> properly include limitations regarding the plaintiff's need for unscheduled work
> breaks and limitations on the length of time he could sit, stand and walk, the
> objective medical evidence in the form of diagnostic tests, clinical notes, and
> opinion evidence from Dr. Krishna.  The ALJ incorrectly did not give the opinion
> of the plaintiff's treating physician, Dr. Krishna and therefore incorrectly
> conducted the five step analysis. . . . [T]he ALJ erred by granting insufficiently to
> the assessments completed by the plaintiff's treating source, Dr. Krishna.  The
> Administrative Law Judge ignored the treating physician rule.

Pl. Mem. at 14.

Defendant maintains that the ALJ's decision "is legally correct and supported by

substantial evidence."  Memorandum of Law in Support of the Commissioner's Cross-Motion

for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the

Pleadings ("Def. Mem.") at 17.

A.      <u>Treating Physician Rule</u>

I will begin by addressing plaintiff's claim that the ALJ improperly weighed the opinion of plaintiff's treating physician, Dr. Krishna, and in doing so, "ignored the treating physician rule." Pl. Mem. at 4. Plaintiff argues that "the ALJ's failure to give Dr. Krishna's opinion controlling weight is legal error" and that "the substantial evidence, specifically, in the form of objective tests, in the form of the EMG objective tests and the clinical notes from Dr. Krishna support the RFC of Dr. Krishna." Pl. Reply at 2, 5.

In considering any medical opinions set forth in the administrative record, the ALJ must give controlling weight to the opinion of a treating physician if it is well-supported by the medical record and is not inconsistent with other substantial record evidence. See Green-Younger, 335 F.3d at 106; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 416.902. When the treating physician's opinion is not given controlling weight, the ALJ must determine the amount of weight to be assigned to the treating source's opinion based upon consideration of the following factors: (1) the length, nature and extent of treatment and the frequency of examination; (2) the relevant evidence presented by the treating source in support of his opinion; (3) whether the opinion is consistent with the record as a whole; (4) whether the treating source is a specialist in the area relating to his opinion; and (5) other factors which tend to support or contradict the opinion. See Shaw, 221 F.3d at 134; 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ need not recite each factor explicitly, provided the ALJ's decision reflects substantive application of the regulation. See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the

-32-

regulation are clear.").  However, an ALJ's failure to set forth "good reasons" for the weight

accorded to a treating source opinion is a ground for remand.  <u>Greek</u>, 802 F. 3d at 375.

     Here, the ALJ addressed Dr. Krishna's opinion as follows:

> On several occasions, Dr. Krishna, broadly stated that the claimant was 100% disabled, or was able to perform a very reduced range of sedentary work. However, whether or not an individual is disabled, or can do any work, is an issue reserved for the Commissioner, and as such, this opinion is not binding on me, nor is it entitled to even special significance.  In response to a request for clarification, Dr. Krishna provided findings from several of his examinations, as well as numerous completed Workers' Compensation forms.  In the most recent report of July 2012, Dr. Krishna concluded that the findings indicated the presence of bilateral wrist derangement and CTS, repetitive strain injury resulting from an industrial event of July 2011 and lumbosacral radiculopathy, resulting from an industrial accident of August 2005.  He prescribed chronic physical therapy, pain management with possible epidural injections, lumbosacral bracing and wrist splints.
>
> With respect to the claimant's functional capabilities, Dr. Krishna indicated that the claimant could "never" perform lifting/carrying, bending, stooping, squatting, simple grasping, fine manipulation, or reaching, and was capable of "occasionally" sitting, standing, walking or driving a vehicle.  However, he provided no specific opinion on the extent of the limitations imposed by the claimant's injuries, but merely checked off several boxes, including one indicating that the claimant is unable to meet the demands of sedentary work.  Noting that the claimant had a very weak grasp, he reported that the claimant was not fit for using both hands, functionally.
>
> However, significant credence cannot be given to these reported conclusions insofar as such limitations are in no way substantially supported by the objective medical documentation of record.  In this regard, it is noted that detailed records of Dr. Krishna give no indication of the significant degree of weakness and lack of functioning ability to the claimant's hands as he reports, nor do his records identify any limitations with respect to driving.  Instead, the claimant drove over 200 miles round trip to see Dr. Krishna.  Clearly, the ability to sit and using his hands for driving nearly two hours per trip, are activities that support sedentary work and his ability to use his hands.
>
> Little weight is given Dr. Krishna's opinions that the claimant is limited to the performance of only a narrow range of exertionally sedentary work.  The conclusions appear to be based upon the claimant's subjective complaints, rather than objective clinical findings observed upon physical examination, and they are not supported by his own examination findings, or the substantial evidence.

> Furthermore, substantial evidence such as the multiple IMEs, the consultative
> examination, [and] the review by SSA expert Dr. Putcha fail to support the
> various opinions of Dr. Krishna."

R. 26-27 (internal citations to record omitted).

The ALJ conducted a thorough review of the multiple IMEs and consultative examinations that he states fail to support Dr. Krishna's opinion, and he expounds upon these contradictory reports throughout his opinion. The ALJ also explained that Dr. Tawil's comprehensive medical examination, which plaintiff successfully completed to obtain a commercial driver's license, does not support the opinion of total disability from Dr. Krishna. R. 21.

Although opinions from Drs. Trapp and Gardianos seemingly corroborate Dr. Krishna's opinion, the ALJ granted those opinions very little weight overall. R. 27. The ALJ explained that Dr. Trapp's opinion that plaintiff is 100% disabled is "patently contradicted by his own reports that the claimant was doing well overall, as well as findings from other examining physician . . . chronicling mild to moderate findings, which left a significant range of the claimant's physical functioning intact." R. 27. With regard to Dr. Gardianos, the ALJ observed that the chiropractor is "not a recognized medical source and . . . his opinion relied heavily on subjective complaints (i.e., 'the claimant reports')." R. 19. The ALJ elaborated that Dr. Gardianos's later reports that plaintiff had 0% temporary disability, "that it was 'unknown' if [plaintiff's] history of illness or injury was consistent with the objective findings, [and that plaintiff's] complaints were not consistent with the history of the injury illness . . . suggest that in finding disability at the earlier date, Dr. Gardianos relied upon the subjective reporting from the claimant." Id. Therefore, those treating physician's opinions do not themselves provide

substantial evidence to support Dr. Krishna's opinion.  Id.   The ALJ's above articulation

demonstrates that he applied the substance of the treating physician rule and amounts to "good

reason" for the weight the ALJ accorded Dr. Krishna's opinion.

B.      The ALJ's RFC Determination

The ALJ found, "[a]fter careful consideration of the entire record," that plaintiff retained

the residual functional capacity "to perform sedentary work as defined in 20 CFR 404.1567(a)."

R. 16.  The ALJ specifically concluded that plaintiff is limited to frequent fingering, and

handling bilaterally; he can frequently reach overhead with the bilateral upper extremities; and

he can occasionally climb stairs and stoop.  He is precluded from crouching, kneeling, crawling

and climbing ropes, ladders or scaffolds.  The claimant also required a sit/stand option once

every two hours."  Id.  Pursuant to Social Security Regulations:

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a).  "'Occasionally' means occurring from very little up to one-third of the

time.  Since being on one's feet is required 'occasionally' at the sedentary level of exertion,

periods of standing or walking should generally total no more than about 2 hours of an 8-hour

workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  SSR

83-10, 1983 WL 31251, at *5.  "A finding as to RFC will be upheld on review when there is

substantial evidence in the record to support the requirements listed in the regulations."  Jiminez

v. Astrue, No. 12 Civ. 3477, 2013 WL 4400533, at *12 (S.D.N.Y. Aug. 14, 2013) (quotation

marks and citation omitted).

Here, plaintiff claims that though "[t]he ALJ indicates that overall, the objective tests provided substantial evidence that the plaintiff can frequently handle and finger bilaterally and frequently reach overhead with occasional stooping . . . he does not explain where in the evidence those limitations are supported." I disagree. Overall, the ALJ provided a thorough, comprehensive explanation of the evidence supporting his RFC determination. The ALJ described the weight he gave to each opinion that supported or failed to support the RFC, along with detailed explanations of how he came to conclusions about each opinion. R. 26-27.

The ALJ's RFC determination was influenced by examining neurologist Dr. Kaznatcheeva's opinion, to which the ALJ gave "significant weight." R. 26. The ALJ detailed the findings behind Dr. Kaznatcheeva's conclusion that "from a neurological standpoint, [plaintiff] was able to return to full duty work." R. 19. The ALJ relied on internist Dr. Steven Rocker's opinion as well, which was afforded "some weight . . . because he was provided the opportunity to perform an in-depth examination of [plaintiff] and his findings are generally consistent with the medical record as a whole and he is an examining source and an expert . . . ." R. 26. The ALJ described the consultative examination, which "failed to elicit findings precluding the ability for sitting, or all standing and walking," and led Dr. Rocker to conclude that plaintiff "was only mildly to moderately limited in his ability to perform work-related activities referable to standing, walking, lifting or carrying . . . ." R. 24. These findings "clearly support the absence of debilitating limitations that would preclude all exertional vocational activity." R. 24.

Next, the ALJ granted some weight to the opinion of state agency medical consultant Dr. S. Putcha, "a highly qualified expert in the evaluation of medical issues in disability claims under the Social Security Act." R. 24, 26. Dr. Putcha's exam revealed that plaintiff could

perform "a wide range of exertionally light work despite his alleged impairments."  R. 24.  The

ALJ found that Dr. Putcha's opinion was entitled to some weight because it was consistent with

progress notes which identified a significant range of daily physical functioning.  Id.

The ALJ further substantiated his RFC determination by pointing to chiropractor Robert

Pearl's independent medical examination, which demonstrated findings consistent with a range

of sedentary work.  R. 23.

Drs. Ramzi and Laurence Tawil completed comprehensive medical examinations of

plaintiff, who visited the doctors for the purpose of obtaining a commercial drivers' license.  The

ALJ pointed to these reports as providing substantial evidence to support the ALJ's RFC

determination.  R. 21.

Dr. Wellin's third IME also supports the RFC.  R. 25.  The ALJ concluded that this

opinion should be granted slight weight.  Id.

The ALJ's assessment of plaintiff's credibility also supported his RFC determination.

The ALJ found that plaintiff's "allegations of debilitating symptoms should be deemed to be not

wholly credible."  R. 25.  The ALJ noted that plaintiff's daily activities, including "extensive

traveling, inclusive of his ability to fly to several states to visit family members, as well as his

ability to drive 220 miles round trip to see Dr. Krishna . . . [his maintenance of] an active hunting

license, his care[] for his dog . . . spen[ding] his free time fishing . . . [and ability] to lift and

carry up to 20 pound[s]" supports the RFC.  The ALJ particularly pointed to plaintiff's "ability

to sit at least two hours on long car rides to see Dr. Krishna."  R. 25-26.

The ALJ highlighted that "multiple independent medical examinations have found that

the claimant is . . . capable of work, even if he is precluded from engaging in his past work and

heavy work activities."  R. 26.  He also determined that Dr. Trapp and Dr. Krishna's opinions

that plaintiff is currently disabled are "poorly supported by substantial evidence," and that plaintiff "has not been entirely consistent in reporting his alleged symptoms in that he denied any numbness or tingling of the lower extremities to Dr. Kaznatcheeva and Dr. Wellin, but complained of tingling in the legs and occasional numbness of the feet to Dr. Rocker and Dr. Krishna." Id. The ALJ also queried "whether the claimant's continuing unemployment is actually due to his medical impairments, rather than his receipt of benefits without having to engage in work," considering that plaintiff has received a disability retirement pension and Workers' Compensation payments since his onset date. Id. The ALJ supported his determination that plaintiff can at least handle and finger frequently on a bilateral basis with Dr. Levin's October 2011 findings. R. 23. The ALJ granted Dr. Levin's findings great weight, "insofar as his impressions are wholly consistent with his own examination results and the totality of the overall objective medical documentation. Furthermore, he is an examining source and an expert." R. 23. The ALJ's RFC was further supported by Dr. Levin's opinion, which noted plaintiff's ability to utilize his hands to repair his furnace, and the ALJ's own observation of the burn marks on plaintiff's hands. R. 25.

The ALJ described that Dr. Krishna's own electrodiagnostic test provided substantial evidence that plaintiff "can at least engage in sedentary work activities and frequently handle and finger bilaterally, and frequently reach overhead bilaterally, along with occasionally stooping." R. 20.

The ALJ also supported his RFC determination that plaintiff had the ability to stoop. He noted that examinations by Dr. Wellin, whose opinion was granted some weight, as well as Dr. Tucker, supported a sedentary residual functional capacity with the ability to occasionally stoop. R. 22-23.

Plaintiff claims that the ALJ's RFC did not properly include limitations regarding plaintiff's "ability to grasp" or his "need for unscheduled work breaks and limitations on the length of time he could sit, stand and walk, the objective medical evidence in the form of diagnostic tests, clinical notes, and opinion evidence from Dr. Krishna." Pl. Mem. 13.  As described above, the ALJ properly accorded "little weight [to] Dr. Krishna's opinions that plaintiff is limited to the performance of only a narrow range of exertionally sedentary work [because] the conclusions appear to be based upon [plaintiff's] subjective complaints, rather than objective clinical findings observed upon physical examination, and they are not supported by his own examination findings, or the substantial evidence." R. 27.  Additionally, substantial evidence supports the ALJ's RFC determination, which did not include limitations for grasping, the need for unscheduled breaks, and limitations on time spent sitting, standing, and walking.  As such, the ALJ's RFC properly excluded these purported additional limitations.

## VI.  CONCLUSION

For the reasons set forth above, I respectfully recommend that plaintiff's motion for judgement on the pleadings be **DENIED** and that defendant's motion for judgment on the pleadings be **GRANTED**.

Dated: March 7, 2015
      White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a).   Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Kenneth M. Karas, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.